Abraham D. GOSMAN

v.

The UNITED STATES.

Leonard SCHWARTZ and Abraham D. Gosman

v.

The UNITED STATES.

WYNDOVER CONVALESCENT HOSPITAL, INC.

v.

The UNITED STATES.

Nos. 147–73, 188–73 and 189–73.

United States Court of Claims.

Feb. 22, 1978.

As Amended on Denial of Rehearing April 27, 1978.

Richard H. Gens, Boston, Mass., attorney of record, for plaintiffs; Leppo & Paris, Boston, Mass., of counsel.

Arlene Fine, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant; Leila M. H. Carp, Columbia, Md., of counsel.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge, delivered the opinion of the court:

These are consolidated Medicare provider cases which come before the court on the parties' cross-motions for summary judgment. Plaintiff Abraham D. Gosman owned and operated four nursing homes (Abbet Manor, Hamilton Pavilion, Nutmeg Pavilion, and Parkway Pavilion) as sole proprietorships. He and plaintiff Leonard Schwartz operated another such facility (Danbury Pavilion) as a partnership. Plaintiff Wyndover Convalescent Hospital, Inc. also operated the same kind of facility. All of these nursing homes were extended care facilities under the Medicare Act, 42 U.S.C. § 1395x(j) (1970) and were providers of services within the meaning of 42 U.S.C.

§ 1395x(u) (1970),[1] participating in the Medicare Program during various periods from 1967 to 1969. The Wyndover home was sold on May 31, 1967; the others were transferred under a sales agreement executed on June 28, 1968. The transfer of the facilities terminated the provider agreements pursuant to 20 C.F.R. § 405.625 (1970). Upon this termination of their participation in the program, all of the facilities submitted cost reports to the Travelers Insurance Company, which had been nominated by them as their fiscal intermediary under 42 U.S.C. § 1395h (1970). After the cost reports submitted by the providers had been audited by certified public accountants, the fiscal intermediary disallowed some of the claims for reimbursement. In June 1973 the plaintiffs filed suit in this court without seeking administrative review; after suspension of proceedings pursuant to an order of this court dated September 19, 1973, a consolidated administrative hearing was held on December 5, 1974. In November 1975 the Hearing Panel sustained most of the disallowances made by the fiscal intermediary, but ruled on a few items in favor of the plaintiffs. The suit then continued here with the plaintiffs contesting several of the Hearing Panel's rulings via their motion for summary judgment, and the defendant, in its motion, supporting the Panel except in one of the aspects in which the decision went for the plaintiffs.

The defendant again challenges this court's jurisdiction, but we adhere to our prior opinions in which we have held that we have jurisdiction over these Medicare provider cases involving cost reporting periods prior to June 30, 1973. *See, St. Elizabeth Hospital v. United States,* 558 F.2d 8, 11, 214 Ct.Cl. 332 (1977); *Overlook*

*Nursing Home, Inc. v. United States,* 556 F.2d 500, 502, 214 Ct.Cl. 60, 64–65 (1977); *Whitecliff, Inc. v. United States,* 536 F.2d 347, 349–51, 210 Ct.Cl. 53, 56–58 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). By the same token it is settled that our scope of review in this type of case is limited; the decisions of the Hearing Panel are to be examined for compliance with the Constitution, statutory provisions, and regulations having the force and effect of law, as well as for the taint of arbitrariness, capriciousness, or lack of support in substantial evidence. *St. Elizabeth Hospital, supra,* 558 F.2d at 11–12, 214 Ct.Cl. at 326–27; *Ulman v. United States, supra,* 558 F.2d 1, 3, 214 Ct.Cl. 308–13 (1977); *Overlook Nursing Home, Inc., supra,* 556 F.2d at 502, 214 Ct.Cl. at 65; *Whitecliff, Inc., supra,* 536 F.2d at 351, 210 Ct.Cl. at 58. Our scrutiny is analogous to the review in Government contract cases under the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970). *Overlook Nursing Home, supra.*

### I

The plaintiffs first contend that the composition of the Hearing Panel was inherently violative of due process, since two of the three members of the panel were employees of the fiscal intermediary. We dealt with the identical contention in *Overlook Nursing Home, Inc., supra,* 556 F.2d 500, 214 Ct.Cl. 60, in the absence of any allegation of actual bias, the court held against the plaintiff. Since there are no indications of any actual bias in the case at bar, the *Overlook* ruling controls.

### II

The claimants' primary substantive assault on the administrative determination is

---

1. For brief descriptions of the rights and obligations of Medicare providers, *see Whitecliff, Inc. v. United States,* 536 F.2d 347, 210 Ct.Cl. 53 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Overlook Nursing Home, Inc. v. United States,* 556 F.2d 500, 214 Ct.Cl. 60 (1977); *Ulman v. United States,* 558 F.2d 1, 214 Ct.Cl. 308 (1977); and *St. Elizabeth Hospital v. United States,* 558 F.2d 8, 214 Ct.Cl. 332 (1977).

References to the Medicare Act provisions, 42 U.S.C. §§ 1395h, 1395x (1970), are to the provisions as they stood before amendment in 1972 pursuant to the Social Security Amendments of 1972, Pub.L.No. 92–603, 86 Stat. 1329. References to the Code of Federal Regulations are to the 1970 edition. No substantive changes were made to the applicable provisions during the cost periods in issue.

that the Hearing Panel improperly rejected depreciation that had been previously allowed as a reimbursable cost, because of gains that were attributed to the depreciable assets as a result of the 1968 sale of the nursing homes. 20 C.F.R. § 405.415(f) (1970) provides in essence for the recoupment by the Government of payments made to providers to the extent the payments are based on depreciation which proves to be excessive upon the sale of the depreciable assets.[2] For this case the application of that regulation depends on the allocation of the sales price to the various transferred assets. The parties to the sales agreements had made no agreement on the allocation of the total sales price of each nursing home to the underlying assets (i. e., the land, buildings, and equipment) of each facility. Likewise, the plaintiffs did not provide the fiscal intermediary with evidence as to the fair market value of the individual assets at the time of the sales. In order to determine the gain on the depreciable assets, the intermediary apportioned the total sale price of each facility to each of the individual assets in accordance with the ratio of the historical cost of each asset to the total historical cost of all of the assets.[3] As a result of this allocation, the gains on the depreciable assets were found to exceed the depreciation taken, and therefore the intermediary disallowed all of the depreciation that had been taken as a reimbursable cost on the facilities.

■ The providers first say that the Hearing Panel, in basically confirming the intermediary's determination, wrongly interpreted 20 C.F.R. § 405.415(f) (1970), *supra,* to require all of the gains arising from the sales to be automatically applied as an offset to depreciation on the depreciable assets, thereby creating a new substantive rule which gives rise to serious issues under the Administrative Procedure Act, 5 U.S.C. § 553 (1970) and the Due Process clause because of the retroactive application of the alleged new rule. We agree, however, with the defendant that that is not a *bona fide* issue in this case. The Hearing Panel established no such new rule, but merely regarded the evidence offered by the plaintiffs to it as unpersuasive on the valuation of the various kinds of assets. On this record the question is factual, not legal, and our task is to decide whether the Panel's adverse determination was unsupported by substantial evidence, arbitrary, or capricious.

To sustain their claims in the depreciation matter, plaintiffs brought before the Panel, as evidence tending to show that the bulk of the gains on the sales were allocable to non-depreciable assets, the initial valuation of each class of assets by the buyer, tax schedules given by the plaintiffs to the Internal Revenue Service showing the original cost of the equipment and losses on the sale of it, state real estate tax conveyance forms which had no allocations of the amount declared between the land and the buildings, and a set of appraisals on the value of the land (but not the buildings) commissioned by the plaintiffs in 1974. None of this material convinced the Panel that the intermediary had erred.

■ Under the controlling standard for judicial review of such an administrative factual determination, we cannot say that the Panel acted impermissibly. It could properly decide that plaintiffs failed in

2. 20 C.F.R. § 405.415(f) (1970) reads as follows:

"*Gains and losses on disposal of assets.* Gains and losses realized from the disposal of depreciable assets are to be included in the determination of allowable cost. The extent to which such gains and losses are includable is to be calculated on a proration basis recognizing the amount of depreciation charged under the program in relation to the amount of depreciation, if any, charged or assumed in a period prior to the provider's participation in the program."

3. The fiscal intermediary, after allocating the total sales price to each class of assets, then deducted from the price allocated to each class of assets certain unamortized finance charges associated with that class of assets, in order to obtain a net sales price for each class of assets. These costs are in issue in another context in Part IV *infra*; the plaintiffs seek to charge off the entire unamortized portion of the finance charges as an allowable expense in the final periods of Medicare participation.

their efforts to attribute all or the largest part of the gain to non-depreciable assets (mainly land and alleged goodwill), and that the historical cost method utilized by the intermediary remained the most appropriate measure.[4] The fact is that plaintiffs' allocations tended to verge on the incredible in their attempt to marshal the gain mostly for the land. Moreover, there were grave inconsistencies in the various valuations before the Panel,[5] and there was also something quite defective in each of the types of evidence proffered by the claimants.

It is not an unfair summation of the record before the Hearing Panel to set forth the following table (prepared by defendant) which shows the percentage gains or losses resulting from the providers' claimed allocation to each class of asset:

| Facility | Holding Period | Total Gain on Sale | Claimed Gain on Land | Claimed Gain (Loss) on Building | Claimed Loss on Equipment |
|---|---|---|---|---|---|
| Abbet Manor | 2 yrs. | 72% | 442% | 62% . | (29%) |
| Danbury | 1 yr. | 21% | 250% | 12% | (29%) |
| Nutmeg | 11-½ mos. | 30% | $238,000 [6] | 5% | (39%) |
| Parkway | 7-½ mos. | 15% | 581% | (3%) | (38%) |
| Hamilton | 7 mos. | 4% | 172% | 8% | (27%) |

Under this allocation the total sales price of the (depreciable) equipment was less than the equipment's book value after depreciation.[7] On the other hand, the land (nondepreciable) gains are proportionately very large; in one instance there is an alleged rise of 581% for a holding period of only a little over seven months. It is said that Gosman testified that there had been zoning changes. There may have been but this does not gainsay the peculiarity of allocations resulting in such spectacular and varying appreciations on nondepreciable assets, while equipment held for a short time is reported as having considerable losses. We simply cannot say that either the fiscal intermediary or the Panel were unable to consider unreasonable plaintiffs' claims that

4. Plaintiffs put forth as a procedural argument that, after they had supplied evidence in support of their valuations, the fiscal intermediary necessarily had the burden of going forward with evidence to disprove plaintiffs' valuations. There is nothing, however, in the statutes or regulations which places such an affirmative burden on the intermediary. The responsibility is upon the providers to furnish adequate accounting data. 20 C.F.R. § 405.453(a) (1970) declares that "Providers receiving payment on the basis of reimbursable cost *must* provide adequate cost data" (emphasis added). The obligation of supplying sufficient evidence cannot be shifted to the defendant where the provider's data proves inadequate. *See Overlook Nursing Home, Inc. v. United States, supra,* 556 F.2d at 505–06, 214 Ct.Cl. at 70–71.

5. For instance, the buyer's valuations differed markedly from those of the plaintiffs; the latter valued the land about five times as high as the former (in the instances where data are available for comparison), while the buyer's equipment valuations exceeded plaintiffs'. In the case of Abbet Manor the equipment was valued by the buyer at $204,800, but by Gosman at only $145,260. The historical cost was $211,-051 for Gosman, and the holding period was two years.

6. No percentage gain on the land can be calculated in the case of Nutmeg Pavilion. Since the land was leased subject to an option to purchase in favor of the lessee, there was no historical cost.

7. In the case of one facility, the amount allocated to equipment apparently did exceed the book value after depreciation. However, the total claimed losses on the equipment of all the facilities listed in the table did exceed the total depreciation taken on the equipment.

The plaintiffs (in their reply to the defendant's cross-motion for summary judgment) now urge that they accept the defendant's valuations for the buildings. However, this concession does not alter their claimed equipment allocations, which they presumably seek to establish by deducting the amounts listed on their real estate tax declarations from the total sale price for each facility.

the value of relatively new equipment would have declined below cost less depreciation, using a double declining balance method with less than standard estimated useful lives.

Moreover, the plaintiffs presented no consistent appraisals or valuations of the various classes of assets in relation to the sale price. *Cf. North Clackamas Community Hospital v. Matthews*, Civil No. 76–199 (D.Ore., filed Dec. 23, 1976) (permissible for Provider Reimbursement Board to use independent appraisal of separate assets, commissioned by parties unable to agree upon allocation of agreed-upon sale price, in preference to an appraisal commissioned subsequently by the plaintiff). There was not even a direct valuation of the equipment, and it is difficult to harmonize the differing figures for the real estate values and also for the equipment which result from the various formulae put forward by the providers. The Hearing Panel's refusal to accept the plaintiffs' own tax declarations as sufficient evidence of valuation was not arbitrary, given that the self-reporting system under the Internal Revenue Code with regard to the recapture of depreciation on equipment and buildings is likely to give rise to considerable self-serving bias. *See* I.R.C. §§ 1245, 1250; *cf.* 20 C.F.R. § 405.-415(f) (1970). The same is true of the Connecticut tax conveyance forms filed by the providers and sought to be used to show value in the proceedings before the Hearing Panel.

As part of their claim that most of the sales gain was attributable to nondepreciable assets, plaintiffs press the contention that a substantial segment of the sale price should be allocated to goodwill,[8] since the sale agreement allegedly required on-going businesses with a minimum of 60 patients each (at the time of execution of the sale agreement some of the facilities were still under construction). One of the items which we are told should have been considered part of the goodwill was a certain set of start-up costs incurred and expensed before the cost reporting periods in issue.[9] The fiscal intermediary disallowed them *in toto* on the ground that they had not been included in the providers' records during the cost periods involved or capitalized as required under a Medicare regulation (HIM–15, § 2132.2). The Hearing Panel held that, though the costs had been expensed, for Medicare purposes they were deferred until the preparation of the cost reports. The Hamilton and Nutmeg Pavilions had been in the Medicare Program approximately one year each. Because HIM–15, § 2132.3B, *supra*, allowed the amortization of start-up costs over a period of 36 months, plaintiffs were allowed 33⅓% of those costs as a reimbursable expense. The Panel found, however, no goodwill involved in the sale of the facilities and noted that none was carried on the books of either the buyer or the seller. We agree with the defendant that the Panel's treatment of the start-up costs cannot be deemed unfair or inequitable, and in the circumstances there was no violation of the Constitution or any statute or regulation having the force of law. *Cf. Overlook Nursing Home, Inc.*, *supra*, 556 F.2d at 505, 214 Ct.Cl. at 71 (plaintiff entitled to portion of start-up costs amortizable during period of participation in Medicare Program). Similarly, the determination that there was no goodwill involved in the sale was scarcely arbitrary in view of the fact that little evidence was presented which would have allowed any sound determination of the existence or fair market value of such goodwill.[10] As it was,

8. The parties use the term "goodwill" to denote the excess of the sale price of the facilities over the fair market value of the land, buildings, and equipment involved in the sale. *Cf. Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 450, 210 Ct.Cl. 431, 437 (1976) (goodwill can be used to denote all the intangible assets of a business).

9. The plaintiffs had originally attempted to claim the start-up costs as an allowable cost during the cost reporting periods in question.

10. In another Medicare provider case, *Belmore Manor, Inc. v. Califano*, No. C 76–909 (N.D. Ohio, filed Oct. 31, 1977), the court approved the decision of the Provider Reimbursement Review Board and stated:

there are substantial indications that the facilities had been losing money and that any figure for goodwill would have been most speculative.[11]

## III

A. The next issue is the disallowance of certain costs incurred by the plaintiffs in connection with advertising by radio, TV, and other media and with public relations activities of a promotional nature, all intended to increase the general occupancy of the facilities. The Hearing Panel held that, though the costs may have been reasonable and prudent, they could not be considered reimbursable because they were not directly related to Medicare patient care. The Panel sustained the intermediary's disallowance of the costs on the basis of the general provisions in 20 C.F.R. § 405.451(a) (1970) and the specific provisions of Provider Reimbursement Manual HIM–15 § 2136.2; the latter expressly disallows the costs of advertising directed to the general public for the purpose of increasing the utilization of the provider's facilities. Plaintiffs say that

they were uninformed of any administrative guidelines in regard to such advertising costs until after the cost periods in question when they received a letter in February 1970. They challenge the application to them of the specific provision of the Provider Reimbursement Manual.

■ First, claimants characterize these advertising expenditures as "indirect expenditures related to lowering the per diem cost of care of the beneficiaries," and therefore necessarily allowable under the Medicare statute (42 U.S.C. § 1395x(v)(1) (1970)) and the general Medicare regulation covering reimbursable costs (20 C.F.R. § 405.451 (1970)).[12] To us, however, it is not unreasonable to read both the Act and the general regulation—each pointing directly to the costs incurred in serving Medicare patients—as precluding reimbursement of such indirect expenditures only tangentially or speculatively related to the actual care of Medicare beneficiaries. It follows that the specific rule of the Provider Reimbursement Manual (HIM–15 § 2136, *supra*) is

"In an instance where plaintiff and previous owner have evinced no clear intention of bargained for goodwill as part of the purchase price, and where all parties to the transaction made no effort to make clear to those not privy to the transaction of the elements of the sale, this Court will not mandate that an intermediary guess the parties' intention and infer an element of goodwill on which the intermediary would then need to place an arbitrary value." [*Belmore Manor, Inc. supra,* slip op. at 1.]

11. A dissenting Hearing Panel member thought there had to be goodwill because the assets and the stock appeared to him to have been overstated by the parties to the sale agreement. We think, however, that the Panel was not compelled to go behind the sales contract the plaintiffs had themselves voluntarily made, in order to revalue the stock and assets.

12. 42 U.S.C. § 1395x(v)(1) (1970) before amendment in 1972, read in pertinent part: "The reasonable cost of any services shall be determined in accordance with regulations establishing the method or methods to be used . . . . Such regulations shall (A) take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance pro-

grams established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (B) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."

20 C.F.R. § 405.451 (1970) provides in pertinent part that:

"(a) *Principle.* All payments to providers of services must be based on the "reasonable cost" of services covered under title XVIII of the Act and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost.

"(c)(3) The determination of reasonable cost of services must be based on cost related to the care of beneficiaries of title XVIII of the Act . . . . However, where the provider's operating costs include amounts not related to patient care, or specifically not reimbursable under the program, such amounts will not be allowable."

inconsistent with neither the statute nor the overriding regulation.[13]

■ Plaintiffs then contend that HIM–15 § 2136 is a substantive rule not promulgated in accordance with the Administrative Procedure Act, 5 U.S.C. § 553 (1970), which requires notice of the proposed rule in the Federal Register with an opportunity to interested members of the public to comment. 5 U.S.C. § 553(b), (c) (1970). There is, however, an exception under 5 U.S.C. § 553(b)(A) (1970) for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." The question is whether this provision of the Reimbursement Manual is a substantive or an interpretative rule.

To solve this problem we need not go exhaustively into all the general criteria for distinguishing one type from another. *See Gibson Wine Co. v. Snyder*, 90 U.S.App.D.C. 135, 137, 194 F.2d 329, 331 (D.C.Cir. 1952); *New Jersey Chapter Incorporated of American Physical Therapy Assn. v. Prudential Life Ins. Co. of America*, 164 U.S.App.D.C. 40, 45, 502 F.2d 500, 505 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1444, 43 L.Ed.2d 762 (1975); *Continental Oil Co. v. Burns*, 317 F.Supp. 194, 197 (D.Del. 1970); *Pharmaceutical Manufacturers Assn. v. Finch*, 307 F.Supp. 858 (D.Del.1970); *Pennsylvania v. United States*, 361 F.Supp. 208 (M.D.Pa.), *aff'd mem.*, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973); *American Assn. of Councils of Medical Staffs of Private Hospitals, Inc. v. Mathews*, 421 F.Supp. 848 (E.D. La.1976); *Saint Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323 (N.D.Cal. 1976); K. Davis, Administrative Law Text 126–31, 135 (3d ed. 1972). All agree that an interpretative rule merely clarifies or explains existing law or regulations. Here, it is enough that the preexisting general regulation (20 C.F.R. § 405.451, *supra*) could easily and reasonably be understood as, in itself, forbidding reimbursement of the claimed advertising expenses. It was, in short, helpful to issue HIM–15 § 2136, but not essential. *Cf. New Jersey Chapter Inc., etc. v. Prudential Life Ins. Co., supra*, 164 U.S.App.D.C. at 502 F.2d at 504–05.

This was how the Government viewed the specific provision. The transmittal letter for the issuance of HIM–15 § 2136 noted:

*Section 2136ff., Advertising Costs,* provide[s] instructions on the treatment of provider-incurred advertising . . . costs. The instructions do not reflect new policy but expand on the existing program position on these costs. Regulation § 405.451 specifies that all payments to providers must be based on the reasonable cost of such services covered under title XVIII and related to the care of beneficiaries. This yardstick of measuring reasonable cost must necessarily apply to the allowability of advertising and membership costs. [emphasis added]

Naturally, the characterization applied by the agency does not control. *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Pharmaceutical Manufacturers Assn., supra,* 307 F.Supp. at 863. But, as we have said, it is clear to us that the new rule effected no change in policy or in law; it explained what the more general terms of the statute and the regulation could already be deemed to require. *Gibson Wine Co., supra.*

The Medicare-provider court decisions which have called certain rules substantive, rather than interpretative, are quite different. In *St. Elizabeth Hospital v. United States, supra,* 558 F.2d 8, 12–14, 214 Ct.Cl. 322, 327–31, the challenged Manual provision altered a prior 10-year period for effecting a change in depreciation to a drastically shorter 2-year period. In *St. Francis Memorial Hospital v. Weinberger,* 413 F.Supp. 323 (N.D.Cal.1976), *now on appeal,* the pre-existing regulation was held to permit a provider either to expense or to capitalize construction costs while the later

---

**13.** In *Moody Nursing Home, Inc. v. Secretary of HEW,* No. 75–72 A, slip op. at 20 (N.D.Ga., Jan. 10, 1977), *now on appeal* to the 5th Circuit, the court approved the disallowance of such advertising costs on the ground that reimbursable costs had to be necessary to the efficient delivery of covered services and related to the health care of the beneficiaries

Manual provision required that these costs be capitalized. Similarly, in *Rio Hondo Memorial Hospital v. Weinberger* (C.D.Cal. 1975), 3 CCH Medicare and Medicaid Guide ¶ 27,508, *now on appeal*—the provision held substantive by the court declared that, when a facility is sold to a related party, the buyer's depreciation basis cannot exceed the seller's—the court seemed to believe that the Manual sharply changed a pre-existing rule.

■ Finally, claimants say that in any event retroactive application of HIM–15 § 2136 to a prior fiscal period denies them due process. What we have already said disposes of that contention. While retroactivity which denies an antecedent right may be improper, retroactivity without such effect is lawful. *See Thorpe v. Housing Authority*, 393 U.S. 268, 281–82, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Coe v. Secretary of H.E.W.*, 502 F.2d 1337, 1339–40 (4th Cir. 1974). Here, as we have stressed, there was no deprivation of a preexisting right given either by statute or by regulation. Nothing was taken away from plaintiffs by the specific provision of the Provider Reimbursement Manual.

[11] B. Defendant contests that part of the Hearing Panel's decision which held that, since the disallowed advertising costs were incurred to stimulate the occupancy rate of the facilities in order to meet a condition of the sales agreement, the sale price of the facilities should be reduced by the amount of the disallowed advertising costs. The defendant notes that the sale agreement was executed on June 25, 1968, and Abbet Manor and Danbury Pavilion were transferred almost immediately thereafter on June 27, 1968. We are told that the advertising costs could not have been incurred to meet any sale condition in regard to these two facilities. The plaintiffs respond that the costs were incurred during the negotiations leading up to the agreement. From the facts, it would appear that those two facilities had been completed as of the time of the execution of the agreement, while the others had yet to be finished. The contract called for the closing on the uncompleted facilities when they had at least 60 patients. Given the occupancy requirement for the incomplete facilities, it is reasonable to assume that the plaintiffs also had to build up the business in their completed facilities during the course of negotiations leading to a package sale of a number of similar facilities. We find nothing arbitrary or capricious in the Hearing Panel's reduction of the sale price by the advertising costs and therefore affirm that decision.[14]

## IV

There is also a controversy over the treatment of unamortized deferred financing charges, incurred in acquiring mortgage financing. Plaintiffs urge that they should be allowed the unamortized balance of the deferred financing charges as a reimbursable cost in the accounting periods in which the transfers of the facilities occurred. The fiscal intermediary permitted only the amounts amortized during the cost periods in question and offset the unamortized balance against the sale price of the facilities. The Hearing Panel affirmed the actions of the intermediary on the basis of HIM–15 § 204, which requires that such costs be amortized over the life of the mortgage and states that the portion pertaining to the particular reporting period is an allowable cost. The providers rely on the testimony of their comptroller that their treatment is a generally accepted accounting procedure, and again argue that a substantive rule not promulgated in accordance with the Administrative Procedure Act is being applied retroactively.

14. Since we hold that the Hearing Panel did not act arbitrarily or capriciously in its determination that the advertising costs were incurred in connection with the sale of the facilities, we do not reach the question of whether this court has jurisdiction over a claim by the defendant for set-off or recovery in Medicare provider cases. *Cf. S & E Contractors, Inc. v. United States*, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972); *Roscoe-Ajax Constr. Co. v. United States*, 499 F.2d 639, 204 Ct.Cl. 726 (1974) (restrictions on the right of the Government to make claims in Government contract cases).

Where there are several acceptable accounting methods, the judgment of the Department of Health, Education and Welfare as to which method most appropriately implements the principles of reimbursement under the Medicare Program is entitled to deference. HIM–15 § 204 does accord with one generally accepted accounting procedure.[15] Moreover, under Medicare only costs properly attributable to the care of beneficiaries of the program are reimbursable. 42 U.S.C. § 1395x(v)(1)(A) (1970); 20 C.F.R. § 405.451 (1970). Carrying out this principle, HIM–15 § 204 gives reimbursability only to those portions of the deferred financing charges which are properly attributable to the time of Program participation. Since the cost of securing mortgage financing is ascribable to the entire life of the mortgage, HIM–15 § 204 is plainly consistent with the general reimbursement principles of the Program.[16]

With regard to the plaintiffs' invocation of the Administrative Procedure Act, what we have said in connection with the disallowance of advertising costs (Part III *supra*) is equally applicable here. HIM–15 § 204 is interpretative, not substantive. No special procedure had to be followed in adopting it. And since it makes no change in the preexisting law, the issue of unjustified retroactivity does not arise. *See* K. Davis, Administrative Law Text 135 (3d ed. 1972). In addition, plaintiffs are hardly in a position to complain. Their practice was to amortize their deferred financing costs; they had not previously expensed them. Accordingly, no new method of accounting was imposed upon them differing from their prior practice. *Contrast Saint Francis Memorial Hospital, supra*, 413 F.Supp. 323; *Columbia Heights Nursing Home and Hos-*

*pital, Inc. v. Weinberger*, 380 F.Supp. 1066, 1072 (M.D.La.1974) (court noted that it would be "grossly unfair, terribly unjust" to allow a fiscal intermediary to apply retroactively to the provider a new method of cost allocation, when the provider had followed a system previously established by the fiscal intermediary).

## V

The last issue involves certain interest-free loans entered on the books of some of the providers, which had been made to related enterprises of plaintiff Gosman, before the providers began their participation in the Medicare Program. As a result of these loans, the fiscal intermediary determined that certain interest expense incurred by the providers could not be allowed under 20 C.F.R. § 405.419(b)(2) (1970), which permits, as a reimbursable expense, only interest on loans necessary to satisfy the financial need of the provider and related to patient care. The intermediary took the position that the sums lent to the related enterprises could have been used to pay back the loans and reduce the need for mortgage financing. The intermediary also refused to allow the sums lent to be included in equity capital on the basis of HIM–15 Ch. 18, which authorizes a return on equity capital only to the extent that the funds are related to providing patient care. The Hearing Panel approved these actions.

The plaintiffs contend that the loans were really Gosman's personal ones appearing on the books of the providers because of "poor bookkeeping practices," and that the determinations of the Hearing Panel were contrary to 20 C.F.R. § 405.402(a), (b)(4), which claimants take as excusing this bookkeeping mistake.[17]

---

15. *See* Accounting Principles Board Opinion No. 12, ¶¶ 16–17.

16. It is important to note that different goals may in some instances be involved in principles of reimbursement under the Medicare Program as contrasted to accounting for the purposes of measuring income. The cardinal standard of Medicare reimbursement is that the Program covers only those costs relating to the health care of covered individuals and not the costs of

individuals not covered. 42 U.S.C. § 1395x(v)(1) (1970); *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 335 (5th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); *Moody Nursing Home, supra*, No. 75–72 A, slip op. at 25.

17. C.F.R. § 405.402 provides in pertinent part: "(a) In formulating methods for making fair and equitable reimbursement for services ren-

The Panel was obviously not compelled to accept Gosman's testimony that the loans were technically "personal,"[18] but even if that be taken as proved *arguendo* we could not upset the determination. Gosman operated a number of nursing homes and related facilities as his own, and the Panel could allowably infer, in the absence of evidence to the contrary, that if he felt able to withhold the funds in question from the providers now before us (on whose books the loans were recorded), and to use the money instead for others of his Medicare enterprises, some of the borrowings made by the providers involved in this case were now shown to be necessary for patient care in these specific facilities. The same is true for the exclusion of the sums lent as equity capital, which the statute (42 U.S.C. § 1395x(v)(1)(B)), the regulations (20 C.F.R. § 405.429) and the Providers Reimbursement Manual (HIM–15 § 1218) limit to amounts related to Medicare patient care. Sums invested outside of the providers now before us need not be deemed invested or related to the care of the Medicare beneficiaries in the particular facilities with which we are concerned in this case.

## VI

In concluding, we emphasize that we find no more than that on the basis of the evidence before it, the actions of this Hearing Panel were not arbitrary, capricious, unsupported by substantial evidence, and were not inconsistent with the Constitution, applicable statutes, or regulations having the force of law. We therefore uphold the Panel's decision. The defendant's motion for summary judgment is granted except to the extent the defendant contests the decision of the Panel allowing the deduction of the advertising costs from the sale price of the

facilities. The plaintiffs' motion for summary judgment is denied and the petitions will be dismissed. Since the Hearing Panel made no determinations with respect to quantum, the cases will be returned to the Panel for computations of the amounts due to the defendant and to the plaintiffs.[19] The dismissal of the petitions is deferred pending these administrative proceedings, further proceedings in this court are suspended under Rules 149–150 for a period of six months. The attorney for the defendant is designated to give the court the information required by Rule 149(f).

*It is so ordered.*

dered beneficiaries of the program * * * [it shall be provided] * * *

"(b)(4) That there be sufficient flexibility in the methods of reimbursement to be used, particularly at the beginning of the program, to take account of the great differences in the present state of development of recordkeeping."

It is doubtful that this regulation, which refers to *methods* of accounting and cost alloca-

tion, was designed to condone slipshod bookkeeping which was bad under any general method of accounting and cost allocation.

**18.** *See* note 17, *supra.*

**19.** Neither party objects to return of the case to the Hearing Panel for this purpose, rather than determination by the Trial Division of this court.