LGH, LTD., d/b/a Larkin General Hospital, et al., Plaintiffs,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

BIG SUN HEALTHCARE SYSTEMS, INC., d/b/a Munroe Regional Medical Center, et al., Plaintiffs,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

INDIAN RIVER COUNTY HOSPITAL DISTRICT, d/b/a Indian River Memorial Hospital, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

Civ. A. Nos. 89–1320, 89–1321 and 89–1355.

United States District Court, District of Columbia.

March 16, 1992.

Dennis M. Barry, Carin J. Sigel, Wood, Lucksinger & Epstein, Washington, D.C.,

for LGH, Ltd. and Big Sun HealthCare Systems, Inc.

Charles M. English, Jr., Stanford V. Teplitzky, Karen S. Guerino, Obet, Kaler, Grimes & Shriver, Washington, D.C., for Indian River County Hosp. Dist.

Donald G. Kosin, Jr., Joel Tornari, Catherine B. Tackney, Office of Gen. Counsel, Dept. of Health & Human Services, Washington, D.C., for Louis Sullivan, M.D.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

These consolidated cases arise out of a dispute between seven Florida hospitals and the Secretary of Health and Human Services ("Secretary") over whether certain assessments paid by the hospitals into a state-operated malpractice insurance fund constitute costs reimbursable under Medicare's old system of reimbursement for inpatient hospital services. Before the court are plaintiffs' and defendant's motions for summary judgment and the oppositions, replies, and supplemental memoranda thereto. The matter has been fully briefed. For the reasons stated below, we grant plaintiffs' motion and deny defendant's motion.

## I. BACKGROUND

### A. Overview of Medicare Provider Reimbursement

Before getting into the legal issues involved, it is necessary to set forth in some detail the statutory provisions and past and current practices governing Medicare reimbursements.

Medicare beneficiaries are entitled to receive hospital services at any hospital participating in the Medicare program as a "provider." 42 U.S.C. §§ 1395d, 1395x(b), 1395x(u). To the extent that hospital services furnished to a Medicare beneficiary are covered by the Medicare program, no charge is made to the beneficiary by the hospital, except for certain deductible and coinsurance amounts. 42 U.S.C. § 1395cc(a). Instead, the hospital is paid directly by Medicare.

From the inception of the Medicare program in 1966 until hospital fiscal years beginning on or after October 1, 1983, the Medicare program paid each hospital its actual "reasonable cost" for covered services. See 42 U.S.C. § 1395f(b)(1). Reasonable cost is defined at 42 U.S.C § 1395x(v)(1)(A) as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." In addition, both direct and indirect costs are covered. Id. The statutory definition of reasonable cost authorizes the Secretary to adopt regulations specifying which costs are allowable, how costs are to be apportioned, and any cost limits that might apply. Id.

In 1983, Congress instituted a fundamental change in the method of payment for inpatient hospital services effective for cost reporting periods beginning on or after October 1, 1983. Social Security Amendments of 1983, Pub.L. No. 98–21, 97 Stat. 65, 149. Under the new prospective payment system ("PPS"), a hospital's actual operating costs are irrelevant in computing the amount of payment for acute care inpatient services. Instead, each patient discharge is assigned a value (known as diagnosis related groups or DRGs) based on the amount of hospital resources that patient's diagnosis and treatment normally require. The DRG values corresponding to all of the hospital's Medicare patient discharges are multiplied by a pre-established prospective payment rate to yield a provider's total Medicare payment. See 42 U.S.C. § 1395ww. As defendant notes, because the PPS system is designed to provide an incentive for hospitals to operate efficiently, it may produce lower annual payments to hospitals for services to Medicare patients than did the previous cost-based reimbursement system. Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Defendant's Motion") at 4.

Under both cost-based reimbursement and PPS, hospital providers enter into agreements with the Secretary and nomi-

nate fiscal intermediaries [1] to implement the Medicare compensation process. 42 C.F.R., Part 421. Hospital providers file with their fiscal intermediaries an annual cost report setting forth their costs during the year. Under the former cost-based reimbursement system, the intermediary reviewed the cost report for each provider to ascertain whether the hospital's costs are allowable under regulations and instructions promulgated or published by the Department of Health and Human Services ("HHS").

The intermediary, after analyzing a given cost report and making any necessary adjustments, issues a Notice of Program Reimbursement ("NPR"). The NPR sets forth the amount due the provider, notes any adjustments, and informs the provider of appeal rights. 42 C.F.R. § 405.1803. If the provider is dissatisfied with the intermediary's determination and the amount in controversy is $10,000 or more, the provider may appeal to the Provider Reimbursement Review Board ("PRRB" or the "Board"), a five-member body comprised of persons knowledgeable in the field of provider payments. 42 U.S.C. § 1395oo (a), (h). Within sixty days after a PRRB decision, the Secretary, acting through the Administrator of the Health Care Financing Administration ("HCFA"), may affirm, reverse, or modify the PRRB's decision. 42 U.S.C. § 1395oo (f)(1); 42 C.F.R. § 405.-1875. Dissatisfied providers may seek judicial review pursuant to the applicable provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* 42 U.S.C. § 1395oo (f)(1).

### B. The Florida Patient Compensation Fund

In 1975, Florida's primary medical malpractice insurance carrier, Argonaut Insurance, pulled out of the Florida malpractice market, leaving health care institutions and physicians unprotected. Rec. I at 248.[2] In response, the Florida legislature enacted the Medical Malpractice Reform Act, Fla. Stat. § 768.54, which created the Florida Patient Compensation Fund ("FPCF" or the "Fund"). Participation in FPCF was mandatory for hospitals, unless the hospital could meet a specific statutory exemption by demonstrating financial responsibility for malpractice claims. Rec. II at 35. Plaintiffs were members of FPCF from 1976 until July 1, 1982.[3] Rec. I at 6; Rec. II at 35; Rec. III at 12.

Generally, insurance premiums must be set at an actuarially sound rate (*i.e.,* one sufficient to cover all liability for adverse medical occurrences that take place in the coverage year, as well as all administrative expenses). Rec. I at 784–85. Actuarially sound membership fees, however, were never assessed during the time plaintiff providers participated in FPCF. *Id.* at 272–73. As a result, FPCF was underfunded from its inception. *Id.*

FPCF was empowered to obtain funds from its participants in two ways: first, by charging a mandatory membership fee for a given year; and, second, by making an assessment for any earlier year for which the amount of money held by the Fund proved to be deficient under the statutory formula. *Id.* at 790–91. Since the fee for membership was relatively nominal,[4] the

---

1. Fiscal intermediaries are organizations, usually large private insurance companies such as Blue Cross and Blue Shield, which have contracted with the Secretary to process claims for payment for inpatient hospital services and to perform certain other administrative tasks.

2. This case is a consolidated appeal from three separate administrative proceedings. Record I refers to the administrative record in Florida Patient Compensation Fund Group I, Case No. 86–467G, Decision No. 89–D32 (*Big Sun*); Record II refers to the administrative record in Florida Patient Compensation Fund Group II, Case No. 86–264G, Decision No. 89–D33 (*LGH*); Record III refers to the administrative record in

Florida Patient Compensation Fund Group III, Case No. 86–454, Decision No. 89–D31 (*Indian River*).

3. Although the last year for which the FPCF covered losses was 1982, it remains in existence to handle claims for the years it did cover.

4. The Fund statute set as an initial rate for hospital FPCF participation an annual membership fee of $300 per bed. Rec. II at 852. This statute gave the FPCF and Florida's Insurance Commissioner discretion to set future year membership fees in an actuarially sound manner. *Id.* at 1285. Though FPCF theoretically

initial fund for each year was not actuarially sound. *Id.* at 783. As a result, deficiencies for some years inevitably would have to be covered through later assessments. *Id.* at 783–84.

To the extent that the fees collected were inadequate to cover claims, the Fund statute provided an assessment mechanism:

> If the Fund determines that the amount of money in an account for a given fiscal year is ... not sufficient to satisfy the claims made against the account, the Fund shall certify the amount of the projected ... insufficiency to the Insurance Commissioner and request the Insurance Commissioner to levy an assessment ... for that fiscal year....

Fla.Stat. § 768.54(3)(d). Under the statute, assessments were based only on *actual* claims. *Id.* Projected future claims, which are considered in most insurance contexts, could not be computed into assessments.

In 1981, FPCF acknowledged that it had a substantial deficit. Accordingly, in January 1982, it certified the first retrospective assessment, based only upon known claims. Rec. II at 1693–1702. A number of legal challenges to the assessment mechanism and the Fund statute's constitutionality ensued, but these were ultimately unsuccessful. *Id.* at 493–97; *see also Department of Insurance v. Southeast Volusia Hospital District*, 438 So.2d 815 (Fla.1983), *appeal dismissed sub nom. Southeast Volusia Hospital District v. Florida Patient's Compensation Fund*, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984). In the meantime, the Fund certified an additional assessment in 1982 and two more in 1983. Rec. II at 694.

### C. Plaintiffs' Reimbursement Claims

The facts giving rise to this reimbursement dispute arose in 1983 when the lawsuits challenging the Fund statute culminated in defeat for the hospitals. Three of the Florida plaintiffs in this action, the Larkin General, Venice, and St. Joseph's hospitals ("LGH group") marked accrued expenses on their books and voluntarily

entered into identical settlement agreements with FPCF in 1984. Rec. II at 693. Plaintiff Indian River Memorial Hospital ("Indian River") similarly accrued a large medical malpractice expense on its financial records and reached a similar settlement agreement with the Fund in 1984. Rec. III at 12, 14. The Munroe, Cedars, and South Miami hospitals ("Big Sun group") made no settlement agreement with the Fund until 1985, but entered accounts on their own books described as medical malpractice expenses accrued in 1983. Rec. I at 143–44, 290–91.

Pursuant to their settlements with the Fund, each of the plaintiff providers agreed to pay assessments for malpractice claims that had been "incurred but not reported" ("IBNR" claims). IBNR is an insurance concept that reflects an expectation at any given time that malpractice incidents have taken place, but that no one has yet come forward to assert a claim or even to make known that an injury was suffered. Rec. II at 1125–26. By definition, all IBNR claims are incurred by the end of an insurance year and therefore will mature into paid claims and expenses. Malpractice, however, is known to have a long "tail," meaning that it takes a long time for claims to be discovered, made, and resolved. Thus, a system which focuses only on known, and not IBNR, claims is statistically likely to substantially underestimate long-term liability. Generally, actuaries must estimate IBNR in order to set insurance rates, although the Florida statute did not allow for that.

These settlement amounts were accrued on each provider's books and subsequently were claimed by the hospitals as a reasonable cost under Medicare. Rec. I at 143; Rec. II at 40; Rec. III at 12. The Secretary's fiscal intermediary, Blue Cross and Blue Shield of Florida, recognized the amounts paid to settle the 1982 and 1983 assessments (*i.e.*, the amounts which had been assessed to cover known costs) as allowable Medicare costs. However, the fiscal intermediary denied reimbursement

---

was able to charge actuarially sound membership rates, it increased the $300 per bed rate

only once during plaintiffs' participation in the Fund, to $360 in the seventh year. *Id.* at 852.

for IBNR claims paid as part of the settlement. Rec. I at 6; Rec. II at 6; Rec. III at 12.

The PRRB, by votes of 3–2, affirmed the intermediary's denials of plaintiffs' claimed costs, holding that IBNR expenses are not reasonable costs under the statute, 42 U.S.C. § 1395x(v)(1)(A), or regulations, 42 C.F.R. § 405.451. Rec. I at 23; Rec. II at 14–20; Rec. III at 19–26. Additionally, the Board found that the providers received no benefit related to patient care in exchange for their agreement to pay IBNR expenses; therefore, reimbursement for these expenses is barred by Medicare's Prudent Buyer rule, Provider Reimbursement Manual ("PRM" or the "Manual") § 2103. Rec. II at 20–21; Rec. III at 28–29.

The Deputy Administrator of HCFA did not review PRRB's decision. Thus, the Board's decision stands as the Secretary's final determination. 42 U.S.C. § 1395oo (f)(1). A timely appeal of the decision was taken in this court.

## II. STANDARD OF JUDICIAL REVIEW

This action is brought under 42 U.S.C. § 1395oo (f)(1) which limits review of the Secretary's final decisions on reimbursement matters by incorporating the standards of the APA. The scope of judicial review under the APA is set forth in 5 U.S.C. § 706, which, in relevant part, provides that the reviewing court shall

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . . .

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute. . . .

The Secretary's decision is entitled to considerable deference under both the "arbitrary and capricious" and "substantial evidence" standards. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 813–14 (D.C.Cir.1981). More specifically, this Circuit has noted that the Secretary's decisions interpreting the Medicare Act are entitled to "great deference." *Humana, Inc. v. Heckler*, 758 F.2d 696, 699 (D.C.Cir.1985), *cert. denied sub nom. Humana Inc. v. Bowen*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *see also Villa View Community Hospital, Inc. v. Heckler*, 728 F.2d 539, 543 (D.C.Cir.1984).

On the other hand, the case law is clear that judicial review may not lapse into "judicial inertia." *Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009, 1023–24 (D.C.Cir. 1979) (citations omitted); *see also Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1498 (D.C.Cir.1988) (review must be "thorough, probing, [and] in-depth") (citations omitted). We must do more than "rubber-stamp" the actions of the Secretary. In spite of the deference due to the Secretary's decisions in the Medicare sphere, the D.C. Circuit Court of Appeals has ruled against HHS in numerous recent provider reimbursement cases. *See, e.g., St. Agnes Hospital v. Sullivan*, 905 F.2d 1563 (D.C.Cir.1990); *Beverly Hospital v. Bowen*, 872 F.2d 483 (D.C.Cir.1989); *Georgetown University Hospital v. Bowen*, 862 F.2d 323 (D.C.Cir.1988); *PIA–Asheville, Inc. v. Bowen*, 850 F.2d 739 (D.C.Cir. 1988); *Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345 (D.C.Cir.1987).

## III. ALLOWABILITY OF IBNR UNDER COST–BASED REIMBURSEMENT

Plaintiffs seek reimbursement for the IBNR expenses under the former cost-based scheme, because they allege these costs accrued in reporting periods beginning before October 1, 1983. The governing regulation, 42 C.F.R. § 413.9 (formerly designated as § 405.451), provides that costs which are reasonable, necessary, and related to patient care shall be allowed. This regulation is consistent with the statutory requirement that providers be reim-

bursed their actual, reasonable costs. 42 U.S.C. §§ 1395f(b), 1395x(v)(1)(A).

There is no dispute that malpractice costs as a generic category of expenses are allowable under the statute and regulations. The allowability of various methods for covering malpractice losses is discussed in the Manual. PRM § 2162. In one of the decisions here under appeal, PRRB noted that "[c]osts for malpractice insurance is a common and accepted occurrence in the hospital industry." Rec. II at 14. Indeed, reimbursement for the membership fees and regular assessments paid by plaintiffs to FPCF have been allowed, Rec. I at 1094, 1103, which could only have occurred if the intermediary agreed that participation in the Fund was a prudent management decision.

The crux of defendant's argument against reimbursing plaintiffs for these IBNR expenses is that they do not constitute reasonable costs under the statute or regulations. Three reasons are proffered as to why these costs are not reasonable. The most significant of these is that the IBNR expenses are not actual costs but, instead, are speculative liabilities. Second, defendant contends that these expenses are not necessary costs related to patient care. Third, defendant argues that these expenses fail to satisfy the prudent buyer requirement and are thus not reimbursable. These will be addressed *seriatim.*

### A. Actual Costs Versus Speculative Liabilities

■ As stated above, under Medicare's former cost-based reimbursement system, costs that are reasonable, necessary, and related to patient care shall be allowed. 42 C.F.R. § 413.9. Implicit in this notion is the idea that the cost be an actual expense. Purely speculative liabilities may not be reimbursed. *Gosman v. United States,* 573 F.2d 31, 38, 215 Ct.Cl. 617 (1978) (advertising expenses only tangentially or speculatively related to patient care not reimbursable); *Medical Rehabilitation Services v. Bowen,* [1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38201, at 21,113–14, 1989 WL 146308 (E.D.Mich.

Sept. 6, 1989) (speculative expenses which may never come due not reimbursable).

■ Defendant argues that plaintiffs' IBNR payments are speculative because they merely represent an estimate of costs of possible future claims. IBNR costs are obviously always speculative to the extent that they cover claims which have yet to be reported. However, it cannot be true that the inability to quantify the amount of IBNR liability with exactitude renders the costs speculative. Defendant admits as much in his Statement of Facts:

> Since the FPCF fee for membership was relatively nominal, the initial fund for each year was not actuarially sound. As a result, deficiencies for some years *inevitably* would have to be covered through later assessments....

Defendant's Motion at 7 (emphasis added and citation omitted). The Secretary has thus conceded the certainty of the need for additional payments relating to FPCF years 1976–1982.

We find that plaintiffs' costs here were actual and not speculative. Plaintiffs actually paid FPCF millions of dollars to cover, *inter alia,* the "special assessments," or IBNR costs. Plaintiffs' Statement of Material Facts Not in Dispute ("Plaintiffs' Statement of Facts") at ¶¶ 11–14. This case is distinguishable from those listed above where reimbursement was not permitted because the costs were deemed speculative. In *Gosman,* the expenditures in question were for advertising, which can hardly be considered as being related to patient care as integrally as malpractice insurance is. 573 F.2d at 38. In *Medical Rehabilitation Services,* the disallowed expenses had not actually been paid by the provider; they were merely evidenced by a promissory note and thus truly were speculative. ¶ 38,201 at 21,113. Here, of course, plaintiffs actually paid the special assessments.

The instant case is more analogous to *Medical Society of South Carolina d/b/a Roper Hospital v. Heckler,* [1984–1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 33,651 at 10,088–90, 1984 WL 48806 (D.S.C. Feb. 27, 1984), which involved

reimbursement of sick leave benefits, accrued annually by plaintiff's employees but rarely paid out within one year of accrual. That court found that reimbursement of accrued sick leave was not speculative since there was an extremely high probability that all accrued sick leave benefits would ultimately be paid out. *Id.* Here, the case for reimbursement is even stronger because the expenditure for IBNR costs was actually made by these hospitals. Thus the payments were not speculative to plaintiffs; they paid actual money to cover actuarily determined future liability.[5]

Defendant's decision was therefore arbitrary and capricious because it distinguished between different types of malpractice costs (IBNR versus non-IBNR) without any basis. In addition, the Medicare statute was violated because defendant refused to reimburse plaintiffs for their reasonable costs associated with the program.

**B. Necessary Costs Related to Patient Care**

 Only costs that are reasonably related to patient care, 42 C.F.R. § 413.9, and necessary in the efficient delivery of needed health services, 42 U.S.C. § 1395x(v)(1)(A), are reimbursable by Medicare.

Defendant argues that these IBNR expenses were not necessary because they were not malpractice insurance costs but "voluntarily-assumed expenses." Defendant's Motion at 23. As discussed *supra*,

the IBNR costs were paid pursuant to settlement agreements between plaintiffs and FPCF. Also included in these agreements were terms allowing past assessments to be paid without interest and ending the hospitals' participation in on-going litigation. Plaintiffs' Statement of Facts at ¶ 12.

The distinction defendant attempts to make here between a necessary cost and a voluntary cost is of no consequence. Initially, it must be recalled that reimbursement was allowed for the non-IBNR retrospective assessments, which means that these were necessary costs. All that distinguishes these assessments from the IBNR costs is exactly when the hospitals had a legal obligation to pay them. Because, as defendant has conceded, the IBNR costs were "inevitable," plaintiffs would ultimately have had to pay their share of the FPCF deficits through what would have presumably been numerous additional retrospective assessments.

Thus, the only way these costs could be considered voluntary is to ignore the fact that a legal obligation would eventually arise whereby plaintiffs would owe FPCF these insurance costs. We find that the disallowed IBNR costs were just as necessary as the retrospective assessment costs for which reimbursement was permitted.

Defendants also contend that these costs were unrelated to patient care. We disagree, finding that the IBNR costs were related to patient care for the same reasons that the reimbursed assessment costs were.

---

5. In addition to the arguments raised above, defendant raised an issue outside the administrative record regarding the alleged speculativeness of the IBNR costs. In 1989 and 1990, FPCF made refunds to certain of the plaintiff hospitals of amounts "in excess of the currently indicated future deficits." Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment, Exhibit A. Defendant argues that this shows the speculative nature of the IBNR claims.

We do not agree that the fact that some refunds were made implies that the payment of the earlier actuarially determined figures should be considered non-reimbursable. The refunds were made based upon a surplus indicated by more recent actuarial projections. Plaintiffs accrued the IBNR costs based upon the best information available at the time, and

relied upon actuary reports using accepted actuary techniques routinely accepted by Medicare. Refunds occur regularly in the normal course of business, and their existence does not carry the stigma of non-reimbursability for the original costs. Instead, Medicare regulations provide a mechanism for dealing with refunds received in a different accounting period from that when the costs were initially paid. 42 C.F.R. § 413.98(3)(c). *Howard University v. Bowen*, [1988–2 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 37,057 at 16,579–80, 1988 WL 33508 (D.D.C. Apr. 4, 1988), states that such a refund should be deducted from the provider's reimbursement in the year the refund was received, but that the amount offset should be calculated as if the refunds were received in the years to which the costs were related.

### C. Prudent Buyer Requirement

■ The Manual requires Medicare providers to act as "prudent and cost-conscious buyer[s]" who should, among other responsibilities, "refuse[ ] to pay more than the going price for an item...." PRM § 2103. The intermediary agreed that it was prudent for plaintiffs to participate in FPCF and pay the non-IBNR costs. Rec. I at 1094, 1103; Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") at 18. Only the prudence of the IBNR payments is questioned.

This argument is odd. In most circles, setting aside reserves for predictable losses is viewed as prudent, not the opposite. Indeed, HHS and PRRB elsewhere criticize FPCF for not previously having set aside funds for IBNR expenses. Rec. II at 19; Defendant's Motion at 22 n. 15. How can it be imprudent to fund IBNR expenses in 1983 and 1984 when setting aside reserves for such claims would have been prudent and allowable in the years 1976–1982?

Defendant's only evidence of the imprudence of plaintiffs' actions is the fact that plaintiffs lost out on the opportunity to earn a commercial return on the investment of the money. Defendant's Motion at 24. This argument, however, misses the point of the prudent buyer requirement. This Medicare rule does not require providers to maximize their profits at every conceivable juncture in order to be reimbursed for their reasonable costs. Instead, it requires those monies which are to be reimbursed to have been spent prudently. It would not have saved HHS and the United States Government one penny if plaintiffs had earned interest on its money before ultimately being retrospectively assessed for the money it instead paid as part of the settlement agreement. Plaintiffs' decisions to pay the IBNR costs when they did cannot, therefore, be considered imprudent for the purposes of PRM § 2103.

## IV. CONCLUSION

For the reasons stated above, we hold that it was arbitrary and capricious, and not in accordance with the Medicare stat- ute, for the Secretary to deny plaintiffs reimbursement for the IBNR costs paid to the Fund. Therefore, plaintiffs' motion for summary judgment will be granted and defendant's motion will be denied. This case will be remanded to the Secretary with instructions that Medicare reimburse plaintiffs for the disputed IBNR costs plus interest in a manner not inconsistent with this opinion.