ANNIE M. WARNER HOSPITAL et al., Appellants,

v.

Patricia Roberts HARRIS, Secretary of The Department of Health, Education and Welfare.

No. 80–1515.

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1980.

Decided Jan. 22, 1981.

Stephanie W. Naidoff, Regional Atty., Diane C. Moskal (Argued), Asst. Regional Atty., Dept. of Health and Human Services, Philadelphia, Pa., for appellee.

James H. Stewart, Jr. (Argued) Nauman, Smith, Shissler & Hall, Harrisburg, Pa., Roland Morris, Duane, Morris & Heckscher, Philadelphia, Pa., for appellants.

Before ADAMS and SLOVITER, Circuit Judges, and BROTMAN, District Judge.*

---

* Honorable Stanley S. Brotman, United States District Court for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

ADAMS, Circuit Judge.

The issue presented by this appeal is whether the federal government, under the Medicare program, must reimburse hospitals for a special dues assessment each paid to the Hospital Association of Pennsylvania (HAP). The purpose of the assessment was to obtain funds for the capitalization of a malpractice insurance company sponsored by the Association. Establishing such a company was necessary to alleviate a crisis in the malpractice insurance market. Appellants, 121 hospitals who are members of HAP, seek to overturn a decision of the Administrator of the Health Care Financing Administration, which was upheld by the district court, denying reimbursement to the hospitals. Because the dues payments were necessary to secure continued insurance coverage, without which the hospitals could not operate, we conclude that the expenditures were a "cost" related to patient care, and therefore reimbursable under Medicare.

I

In the autumn of 1975, Employers of Wausau, the leading malpractice insurance carrier operating in Pennsylvania, announced that it would no longer provide malpractice coverage. This announcement coincided with the enactment by the Pennsylvania legislature of the Health Care Services Malpractice Act, which required hospitals to carry professional liability insurance as a condition for continuing in operation. Act of October 15, 1975, P.L. 390, No. 111, 40 Pa.Stat. § 1301.701.

These actions precipitated a crisis for Pennsylvania hospitals: many faced a loss of coverage or an inability to obtain coverage at the very time such coverage became mandatory under state law. For those institutions fortunate enough to acquire or maintain insurance policies, Wausau's withdrawal from the market meant that there would be huge increases in the cost of malpractice insurance.[1]

To ameliorate the situation, the Hospital Association proposed to its membership the creation of an insurance company wholly owned by HAP. At that time state law would not permit individual hospitals to insure themselves,[2] nor would it allow hospitals to secure insurance with out-of-state companies. 40 Pa.Stat. § 1301.701(a). Consequently, the HAP-owned company was the only mechanism available to meet the emergency. The Insurance Department required the new company to maintain a large underpinning of capital and surplus. In order to raise the requisite amount of capitalization, HAP levied a special dues assessment of $62 per hospital bed. This levy produced $2.5 million in capital for the newly established Pennsylvania Hospital Insurance Company (PHICO).

HAP chose the device of a dues assessment as the means of raising capital partly because it could require all members to contribute whether or not they ever purchased PHICO insurance. Thus, HAP made payment of the assessment an obligatory condition for maintaining membership. HAP also selected the dues assessment with an eye toward Medicare reimbursement policies. Regulations of the Department of Health, Education, and Welfare (HEW) contained in the Provider Reimbursement Manual authorized reimbursement of the cost of membership in professional associations such as HAP. HIM–15, § 2138.1. This regulation specifically mentioned special assessments as a reimbursable item.

When auditing the cost reports of each of the member hospitals, the fiscal intermediaries monitoring the Medicare program dis-

---

1. For a discussion of the scope and effects of the crisis, see Berkman, *Self-Insurance of Hospital Malpractice Liability: A Dissection of Pennsylvania Act 111 and State and Federal Regulations*, 51 Temp.L.Q. 158, 158–162 (1978).

2. The legislature subsequently amended the Act to permit self-insurance. Act of July 15, 1976, P.L. 1028, No. 207, § 6. The Insurance Department, however, did not issue final regulations to implement the self-insurance provisions until July, 1977. Thus, self-insurance was not a realistic legal option for appellant hospitals at the time they needed to act. See Berkman, *supra* note 1, at 167.

allowed the dues payments to HAP, concluding that they were not reimbursable costs. The hospitals appealed this decision to the Provider Reimbursement Review Board (PRRB). By a vote of 3–2 the PRRB upheld the disallowance and denied reimbursement.

The majority of the Board acknowledged that the hospitals had "amply demonstrated the need to create a new mechanism" for obtaining malpractice insurance, and, that given the time pressures, they had brought about the least costly, and perhaps the most effective, device for doing so. The PRRB also stated that it "appears obvious that malpractice insurance is related to patient care and is in keeping with" HEW regulations detailing reimbursable costs. Despite these observations, the majority concluded that the assessment represented a future-oriented investment rather than a cost. In support of this decision, two considerations were offered: (1) that the dues payments provided the foundation for an enterprise that would endure into the future and return future services and benefits to the hospitals; and (2) that the initial amount might be returned to the hospitals upon the dissolution of PHICO.

Dissenting members of the PRRB agreed that investments are not reimbursable, but they reasoned that the HAP assessment was an expenditure, or cost, necessary to enable the hospitals to remain in operation. They were persuaded that the dues payment should be reimbursed because the amount of capitalization was required by state law and because there was an undoubted need to create the insurance company in order to guarantee the continued provision of health care services. While acknowledging that a recently promulgated reimbursement regulation, HIM–15, § 2162.2(B) (1978), disallowed payments for capitalizing insurance companies, the dis-

senters regarded the need to establish the company and the state law mandate as factors warranting an exception in this instance. Finally, the dissenters observed that it would be inequitable if Medicare did not reimburse the hospitals, because so long as Medicare paid for the cost of insurance, the program was obtaining a benefit from PHICO in the form of substantially reduced premiums and administrative costs.

The hospitals appealed the adverse decision of the PRRB to federal district court. The district court affirmed the Board, maintaining that the dues assessment was a capital expenditure that was tangential to the current ability of the hospitals to furnish patient care. This appeal followed. Because we conclude that the PRRB and the district court gave insufficient recognition to the exigencies and lack of alternatives facing the hospitals, we reverse.

## II

■ According to the general policy adopted by the Medicare statute, health care providers shall be reimbursed for the reasonable direct or indirect cost of furnishing services to individuals covered by the program. 42 U.S.C. § 1395x(v)(1)(A) (1976). HEW regulations supply some further elaboration, and state that all necessary and proper costs shall be reimbursed. 42 C.F.R. § 405.402. Necessary and proper costs are defined as costs that "are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. § 405.451(b)(2).

The more specific regulations applicable to this appeal are found in the Provider Reimbursement Manual, HIM–15. In § 2162, the manual explicitly provides for reimbursement of costs incurred for malpractice insurance.[3] In addition, § 2138.1

**3.** The recent amendment to § 2162 that disallows payments for capitalizing insurance companies is not controlling of the present appeal. This new guideline, HIM–15, § 2162.2(B) (1978), did not exist during the accounting years under scrutiny here, so we must resolve the question of reimbursing ability according to the reimbursement policies then in effect. Ac-

cordingly, there is no occasion in this appeal to decide whether the new guideline is consistent with the overriding policy of the statute or the Code of Federal Regulations, or whether it would give way in the face of an emergency such as the one that faced Pennsylvania hospitals in 1975.

authorizes reimbursement for the cost of membership in professional associations, "includ[ing] initiation fees, dues, [and] special assessments...." To determine the reasonableness of any such membership cost, the manual declares that HEW "will look to comparable providers, as well as [to] the justification by the individual provider."

There are few cases interpreting these regulations that might guide our resolution of the question whether the dues payment is a cost or an investment. The district court relied on *Doctors Hospital, Inc. v. Califano*, 459 F.Supp. 201 (D.D.C.1978), which disallowed reimbursement for interest paid on a note to purchase a certificate of need authorizing construction of a new hospital building. The court in *Doctors Hospital* disallowed the expense because it was a capital expenditure that would be devoted to delivery of services only in the future. In keeping with the classification of the payment as a capital expense, the court indicated that the hospital would be able to recompense the interest outlay in the future: once the building was complete and in service, its total cost, including interest, could be amortized and reimbursed according to normal accounting principles for capital expenditures.

 *Doctors Hospital* sheds little light on the problem at hand, because the dues payment cannot realistically be labeled as a "capital expenditure." Under Medicare regulations the term "capital expenditure" has a particular meaning: it is used to denote expenses for property, plant, or equipment for which the approval of a health planning agency or a certificate of need is usually required. 42 C.F.R. § 405.-435. A payment to retain membership in a hospital association, which the association uses to purchase shares in a corporation,

bears none of the indicia of a capital expenditure. It produces no tangible, depreciable asset or facility, and there is no need for any sort of health planning agency authorization. We conclude, therefore, that the district court erred when it relied on *Doctors Hospital* to characterize the dues payment as a depreciable "capital expenditure."

To support its argument that the dues payment is only tangentially related to patient care, HEW directs our attention to *Gosman v. United States*, 573 F.2d 31, 215 Ct.Cl. 617 (1978). In *Gosman*, the court disallowed reimbursement for the cost of advertising that was designed to increase the occupancy rate of the hospital. The alleged connection to patient care was that greater occupancy would reduce the per diem cost of serving Medicare patients. The court posited, however, that the expense of delivering services to current patients was not affected by the future occupancy rate or the speculative cost of future services.

The connection to patient care is far more secure in the present case. Indeed, HEW's regulations concede that the cost of obtaining insurance is sufficiently related to the delivery of health care services to warrant reimbursement. HIM–15, § 2162. We find these regulations, and the spirit behind them, to be persuasive here.

 In light of the elements recognized by the PRRB, namely, the insurance crisis facing Pennsylvania hospitals, the need to act expeditiously, the lack of other viable alternatives, and the state legal requirements for a certain level of capitalization, the dues payment appears to have been essential for obtaining insurance.[4] In fact, the hospitals could not have continued to

---

It is also arguable that the promulgation of the guideline in 1978 indicates a change in the pre-existing policy. Under this view, assessments for capitalizing insurance companies were reimbursable under pre-1978 standards, so that the new specific guideline was necessary to alter the situation.

**4.** Basing reimbursement upon recognition of the exigent situation and of the vital need to

explore alternatives to commercial insurance is consistent with one of the principles and goals of reimbursement announced by HEW. A stated objective of the Medicare program is "that there should be a recognition of the need of hospitals and other providers to keep pace with growing needs and to make improvements." 42 C.F.R. § 405.402(b)(6).

operate without professional liability coverage, and the establishment of PHICO was the only course which held promise that insurance would still be available. A payment that is necessary to secure malpractice coverage would certainly seem to be an insurance "cost." Since such costs are reimbursable under HEW regulations, the special dues assessment should be deemed a reimbursable expense. In this situation the assessment fits within the definition of a "necessary and proper cost"; it is an expenditure that is "appropriate and helpful in developing and maintaining the operation of patient care facilities." 42 C.F.R. § 405.451(b)(2).

■ Further support for the conclusion that the assessment should be reimbursable is found in the HEW guidelines that authorize reimbursement for the costs of membership in hospital associations. HIM–15, § 2138.1. The payment in question here was necessary for maintaining membership in HAP. Indeed, the HAP affiliation of the sole hospital that failed to meet the assessment was terminated. Because HEW deems membership in HAP to be sufficiently related to the provision of health care services for reimbursement, it follows that a payment required to continue the membership should also be reimbursable. Insofar as § 2138.1 indicates that HEW will look to the providers' justification in assessing the reasonableness of any particular membership cost, the admitted need to establish PHICO provides ample justification in this case.

■ Finally, we conclude that the dues assessment is a reimbursable cost, rather than an investment, because the payment shows none of the traditional characteristics of an investment. The hospitals have no expectation of profit from PHICO, nor is there any possibility of profit. The hospitals are not shareholders in the new corporation, nor do they have an appreciable asset that may be held for gain or sale. It is not even certain that the hospitals will recoup their initial payment if PHICO is ever dissolved, because redistribution of any portion of the contribution—assuming that

any remains—is in the absolute discretion of the Directors. In short, no "return on investment" is contemplated in any traditional sense of the term. Although there are future benefits, in that insurance will be available and will cost less, these advantages will redound to the benefit not only of the hospitals, but to the public, the entire health care industry, and the Medicare program itself. Thus, in contrast to the view of the PRRB, we do not regard this generalized societal benefit to be a future "return" that would warrant denominating the dues payment as an "investment."

For the reasons set forth above, the judgment of the district court will be reversed, and the matter remanded to the district court with instructions to return the matter to HEW for action consistent with this opinion.