## LAWRENCEVILLE NURSING HOME, INC., Plaintiff,

v.

## Richard S. SCHWEIKER, Secretary of Health and Human Services, and the Prudential Insurance Co. of America, Defendants.

### Civ. A. No. 80–3867.

United States District Court,
D. New Jersey.

Jan. 13, 1982.

---

Thomas A. McKinney, Waldman & Renda, P.A., Hawthorne, N. J., for plaintiff.

G. Donald Haneke, Asst. U. S. Atty., Trenton, N. J., for defendants.

## OPINION

DEBEVOISE, District Judge.

Plaintiff, Lawrenceville Nursing Home, Inc., brings this action pursuant to section 1878(f) of the Social Security Act, 42 U.S.C. § 1395oo, for review of a decision of the Provider Reimbursement Review Board denying reimbursement under the Medicare program, 42 U.S.C. § 1395, *et seq.* The

Board decision from which plaintiff appeals upheld a determination by plaintiff's fiscal intermediary, the Prudential Insurance Co., to: (a) recapture accelerated depreciation, and (b) disallow certain legal fees for which plaintiff had sought reimbursement.

## I. Background

### A. Statutory and Regulatory Framework

The Medicare program is "a federally funded health insurance arrangement designed to reimburse health care providers for the basic costs of rendering certain limited services to patients over the age of sixty-five." *Monmouth Medical Center v. Harris*, 646 F.2d 74, 76 (3d Cir. 1981). Under the statute, providers who have rendered services to eligible Medicare beneficiaries are entitled to reimbursement for the lesser of the "customary charges" or "reasonable cost" of such services. 42 U.S.C. § 1395f(b). Payments are to be made from a federally administered fund at periodic intervals, not less than monthly, "with necessary adjustments on account of previously made overpayments or underpayments." 42 U.S.C. § 1395g. The initial responsibility for making reimbursement determinations may be delegated to a public agency or private organization designated a "fiscal intermediary" upon agreement with the Secretary of Health and Human Services. 42 U.S.C. § 1395h.

If a provider is represented by a fiscal intermediary, the intermediary makes interim estimated payments to the provider for its Medicare-related services from its own funds. The intermediary is then reimbursed, in turn, by the Secretary of Health and Human Services. At the close of each fiscal year, the provider prepares costs reports of its reimbursable expenses. "The intermediary is then responsible for auditing the provider's annual cost reports to determine which costs were properly charged to Medicare and make any necessary adjustments." *Moody Nursing Home, Inc. v. United States*, 621 F.2d 399, 400 (Ct. Claims 1980); *see also Pasadena Hospital Association, Ltd. v. United States*, 618 F.2d 728, 729 (Ct. Claims 1980).

"*Reasonable Cost*". This action involves a post-audit determination by plaintiff's fiscal intermediary that plaintiff's reimbursement claims for Medicare-related services exceeded the "reasonable cost" of such services.

"Reasonable cost" is a concept upon which the Medicare statute elaborates at some length. Section 1861(v)(1)(A) of the Act, 42 U.S.C. § 1395x(v)(1)(A), provides, in relevant party, that:

> The reasonable cost of any service shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included.

The "cost" section further provides that "such regulations" shall:

> take into account both direct and indirect costs of providers and services ... in order that ... the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.

Finally, the "cost" section provides that the regulations must:

> provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

Regulations promulgated by the Secretary, pursuant to authority granted in the statute, further define the concept of "reasonable cost." They provide that "[a]ll necessary and proper expenses of an institution in the production of services, including normal standby costs, are recognized." 42 C.F.R. § 405.402(a). The term "necessary and proper costs," according to the regulations, subsumes "costs which are appropri-

ate and helpful in developing and maintaining the operation of patient care facilities and activities ... [and are] usually costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b)(2). More detailed rules illuminating the general concepts set forth in the statute and the Code of Federal Regulations can be found in the Provider Reimbursement Manual (HIM–15).[1] *See generally Annie M. Warner Hospital v. Harris*, 639 F.2d 961, 964 (3d Cir. 1981).

*Capital Costs.* By regulation, the Secretary has expressly authorized the reimbursement of providers for capital expenditures incurred for the purpose of providing services to Medicare program beneficiaries. Capital costs, either for the construction of buildings or the purchase of equipment, are reimbursed through the vehicle of depreciation allowances. 42 C.F.R. § 405.415(a). As a general principle, allowable depreciation expenses are calculated by prorating the cost or other basis (e.g., fair market value) of a capital asset, less its salvage value, over the estimated useful life of the asset.

Prior to August 1, 1970, applicable regulations issued by the Secretary permitted providers to claim depreciation expenses on an accelerated basis. 42 C.F.R. § 405.415 (1967). Current regulations, however, severely curtail the taking of accelerated depreciation for capital assets acquired after August 1, 1970. 42 C.F.R. § 405.-415(a)(3)(iii). The regulations now in effect do permit providers to continue taking accelerated depreciation, under either a "declining balance" method or "sum of the years digits" method, for capital assets which were acquired and depreciated using an accelerated method before August 1, 1970. 42 C.F.R. § 405.415(a)(3)(ii). They provide, however, that the excess of accelerated over straight-line depreciation on these items may, under certain circumstances, be "recaptured".

The regulations which became effective on August 1, 1970 require recapture of accelerated depreciation whenever: (1) a provider terminates his participation in the Medicare program, or (2) "the health insurance [Medicare] proportion of [a provider's] allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation." 42 C.F.R. § 405.415(d)(3). The Provider Reimbursement Manual (HIM–15) sets forth a more concrete test for determining when the proportion of Medicare patients served by a provider falls sufficiently to require recapture of accelerated depreciation, even though the provider has not terminated Medicare services altogether. Section 136.-4.B of the Manual provides that recapture will be triggered when "the provider's ratio of health insurance [i.e., Medicare-reimbursable] days to total inpatient days ... has decreased 25 percent or more" between the "base period" (all fiscal years prior to the year audited) and the "computation period" (the year in which the fiscal intermediary conducts its audit) and also, between the same periods, the total number of health insurance (Medicare) days has decreased 25 percent or more. Recapture is effected only if the proportion of Medicare patients served during the base period was greater than 5 percent.

### B. *Factual Background*

The facts underlying this controversy are not in dispute.

Plaintiff, Lawrenceville Nursing Home, Inc., a 100-bed proprietary nursing facility, is a certified provider of skilled nursing services under the Medicare program, and has been such a provider since November 11, 1969. (Tr. 12). Since plaintiff began its participation in the Medicare program, it has utilized the Prudential Insurance Co. as its fiscal intermediary. Plaintiff filed its first annual Medicare cost report with its fiscal intermediary following the fiscal year ending October 31, 1970.

---

1. Whether the rules contained in the Provider Reimbursement Manual are merely "interpretive rules" or substantive rules requiring notice

and comment is a matter of some debate. *See Gosman v. United States*, 573 F.2d 31, 39 (Ct. Cl.1978).

This action is brought to review reimbursement adjustments made by plaintiff's fiscal intermediary following its audit of the fiscal years 1977 and 1978.

*FY 1977: Accelerated Depreciation.* Because plaintiff began participating in the Medicare program and acquired depreciable assets prior to February 5, 1970, it was entitled, under the regulations which became effective on August 1, 1970, to depreciate its capital assets on an accelerated basis. 42 C.F.R. § 405.415(a)(3)(ii). Taking advantage of this opportunity, plaintiff elected to utilize accelerated depreciation at the time it filed its first annual cost report in 1970 and for each subsequent fiscal year through 1977. The accelerated depreciation was, of course, at all times subject to recapture in the event that plaintiff terminated or substantially reduced its services to Medicare patients.

On March 12, 1979, upon completing an audit of plaintiff's cost reports for the fiscal year ending October 31, 1977, plaintiff's fiscal intermediary notified it that, due to a fall-off in its Medicare utilization (i.e., proportion of Medicare patients to total patients served), a decision had been made to recapture the excess of accelerated over straight-line depreciation for the years 1971 through 1976. (Tr. 131). The recapture decision was supported by statistics showing that the proportion of Medicare patients served by plaintiff, as well as the overall number of Medicare patient days at the nursing facility, had decreased by more than 25 percent between the "base period" of 1971–1976 and the "computation period" of 1977. (Tr. 104–105).[2] The total sum the intermediary sought to recapture was $23,067. (Tr. 131).[3]

An analysis of the figures contained in the administrative record indicates that in the fiscal years 1972 and 1976 plaintiff had also experienced a reduction in Medicare patient days and overall Medicare utilization of sufficient magnitude to trigger the recapture provisions set forth in section 136.4 of the Provider Reimbursement Manual. The fiscal intermediary did not, however, seek to recapture any accelerated depreciation in its audit adjustments in the audit for those years.

*FY 1978: Legal Fees.* In its annual cost report for fiscal year 1978, plaintiff sought reimbursement for $102,627 in legal fees. These fees were incurred in defending itself and its principal, Frank Puzio, Sr., against criminal Medicare fraud charges brought by the United States. Both defendants were acquitted of the fraud charges after trial.

In its audit adjustments for fiscal year 1978, plaintiff's intermediary adjusted the claimed legal expenses downward, as follows. Fifty per cent of plaintiff's *total* legal expenses of $106,362, or $53,181, were deemed to have been incurred solely for the personal defense of Frank Puzio, Sr., and were disallowed altogether. The balance of the legal expenses claimed, $49,446, was deemed to have been incurred for the defense of the corporation and subjected to a "step-down" cost allocation procedure. Under the "step-down" procedure, general administrative costs are allocated between Medicare and non-Medicare patients and reimbursement is made only for that portion of the costs attributable to the Medicare program. 42 C.F.R. § 405.453(d); *see Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 575 (D.C.Cir.1980). Consequently, plaintiff received only partial reimbursement for the legal fees attributable to the defense of the corporation.

**2.** The intermediary's decision to recapture accelerated depreciation in its FY 1977 audit was initially based upon a comparison between plaintiff's Medicare utilization in FY 1977 and its Medicare utilization in FY 1976 alone, rather than the full "base period" from 1971–1976. (Tr. 102). In a letter dated October 18, 1979, the intermediary acknowledged its error and submitted more complete calculations (Tr. 101, 103–104). The intermediary pointed out, however, that its error in calculation did not affect its decision to make a recapture of accelerated depreciation since the decrease in Medicare utilization was greater than 25 percent using either method.

**3.** The intermediary apparently revised this figure downward to $22,132 subsequent to sending out its March 12, 1979 notice. (Tr. 33).

## C. *Procedural History*

Plaintiff was notified of the intermediary's audit adjustments for fiscal year 1977 on March 12, 1979 and of the adjustments for fiscal year 1978 on December 13, 1979. (Tr. 60, 131). By agreement with the intermediary, plaintiff arranged to have its objections to both audits heard at one time by the Provider Reimbursement Review Board. (Tr. 59, 100). The Board then conducted a review pursuant to the provisions of 42 U.S.C. § 1395*oo.*

Plaintiff argued before the Board that its fiscal intermediary had erred in effectuating a recapture of accelerated depreciation in fiscal year 1977 and disallowing legal expenses in fiscal year 1978. In an opinion dated October 10, 1980, the Board affirmed the intermediary's cost adjustments in all respects. Plaintiff then brought this action for review of the Board's decision, pursuant to 42 U.S.C. § 1395*oo* (f).

## D. *Scope of Review*

■ The statute authorizing judicial review of a decision of the Provider Reimbursement Review Board specifies that the review is to be conducted in accordance with the "applicable provisions" of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Since the facts underlying the agency decision are not in dispute, the sole issue to be determined here is whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see Columbus Community Hospital v. Califano*, 614 F.2d 181 (1980).[4]

## II. *Recapture of Accelerated Depreciation*

Plaintiff first challenges the determination of the Board that the intermediary properly recaptured plaintiff's accelerated depreciation for the years 1971–1976 in its audit adjustments for the fiscal year 1977. Plaintiff does not take issue with the intermediary's determination that its Medicare utilization decreased more than 25 percent in fiscal year 1977, thus triggering the recapture provisions set forth in section 136.4 of the Provider Reimbursement Manual, nor does it challenge the validity of the interpretive rules set forth in the Reimbursement Manual as a clarification of the general rule contained in the Code of Federal Regulations at 42 C.F.R. § 405.-415(d)(3). Rather, it contends that: (a) the intermediary's decision to recapture accelerated depreciation for all the years in which it had been taken was not timely; and (b) that the intermediary was estopped to recapture depreciation in 1977 by virtue of its failure to effectuate recapture in previous fiscal years.[5]

■ Plaintiff argues that the intermediary's recapture determination, at least insofar as it extended to the excess of accelerated over straight-line depreciation taken in the fiscal years 1971 through 1974, was time barred by the three-year limitations period set forth in 42 U.S.C. § 1395gg. This section of the Medicare statute authorizes the recoupment of overpayments to providers from individual patients who have benefitted from such expenditures if certain conditions are met. Among the conditions is a requirement that the "provider of services . . . was without fault with respect to the payment of such excess over the correct amount." 42 U.S.C. § 1395gg(b)(1)(B). A provider is "deemed to be without fault if the Secretary's determination that more than such correct amount was paid was made subsequent to the third year following the year in which notice was sent to such individual that such amount had been paid." 42 U.S.C. § 1395gg(b). This statutory section does not, by its terms, either

---

4. Since the facts are not disputed, the "substantial evidence" test set forth in 5 U.S.C. § 706(2)(E) need not be applied. The issues for determination require interpretation of the relevant statutes and agency regulations, and can be decided as a matter of law.

5. Although plaintiff argued at an earlier stage of these proceedings that the recapture provisions set forth in the regulations could not lawfully be applied to it because they were impermissibly retroactive and it had a right to rely upon the regulations as they stood at the time it entered the Medicare program (Tr. 129), it has not pressed this argument on appeal.

provide for a recoupment of overpayments from a provider or create any statute of limitations for recoupments from providers who have been overpaid. The three-year period referred to simply sets forth a precondition for recoupment from a Medicare beneficiary of overpayments for services which he has received from a provider. Nevertheless, at least one court has construed the section to create a three-year statute of limitations for recoupment of overpayments from providers unless the presumption that the provider is not at fault can be rebutted by the Secretary. *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329, 342 (5th Cir. 1975), *cert. den.* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976).

Plaintiff further argues that recoupment of accelerated depreciation taken more than three years prior to the intermediary's decision to recapture is time-barred under the Secretary's own regulations governing the reopening of intermediary decisions. The regulations provide, in relevant part, as follows:

> (a) A determination of an intermediary ... may be reopened with respect to findings on matters at issue in such determination or decision ... either on motion of such intermediary ... or on the motion of the provider affected by such determination or decision to revise any matter in issue at any such proceedings. Any such request to reopen must be made within 3 years of the date of the notice of the intermediary ... No such determination or decision may be reopened after such 3 year period except as provided in paragraphs (d) and (e) of this section.

> .    .    .    .    .

> (d) Notwithstanding the provisions of paragraph (a) of this section, an intermediary determination ... shall be reopened and revised at any time if it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision.

> (e) [Not relevant here].
> 42 C.F.R. § 405.1885.

The cited statutory and regulatory provisions may well protect a provider from the reopening of reimbursement decisions and the recovery of overpayments by a fiscal intermediary when three years or more have passed from the intermediary's final Program Reimbursement Notice for a given fiscal year. *Pasadena Hospital Association, Ltd. v. United States, supra,* at 730–32. Here, however, the intermediary did not seek to reopen any prior reimbursement determination or to recovery any overpayments which it had previously made in error. Rather, it sought only to effectuate the independent regulatory provisions authorizing the recapture of accelerated depreciation upon a substantial reduction in Medicare utilization by the provider.

It is clear that the statute of limitations governing the recoupment of erroneous overpayments does not, and cannot, apply to the recapture of accelerated depreciation. After the recapture provisions set forth in 42 C.F.R. § 405.415(d)(3) became effective on August 1, 1970, all providers were put on notice that capital assets could be depreciated only on the condition that recapture would be effectuated should they terminate their participation in the program or undergo a substantial reduction, for whatever reason, in the proportion of Medicare patients they served. In effect, the Secretary, by permitting continued accelerated depreciation, offered a cash advance to the provider on his capital depreciation expenses, with the proviso that the loan or advance would be called in upon the provider's reduction in Medicare participation. By accepting such a cash advance, a provider necessarily accepted the loan conditions which accompanied it. Since the money advanced is subject to recall at any time until conventionally calculated depreciation expenses have overtaken accelerated depreciation, a period of time which could span a decade or longer depending upon a given asset's estimated useful life, a three year statute of limitations would defeat the very purpose of the recapture provisions.

Providers were initially permitted to depreciate their capital assets utilized in the

Medicare program on an accelerated basis not because this method of prorating costs was thought to approximate the actual depreciation in value of the assets but for the purpose of attracting providers into the Medicare program. *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1260 (3d Cir. 1978). The Secretary subsequently perceived, however, that permitting accelerated depreciation "created a loophole, and permitted some providers to obtain undeserved windfalls." *Id.*

If a provider elected to depreciate his capital assets on an accelerated basis, he was able to charge the Medicare fund for a substantially greater proportion of his capital costs in the early years of the asset's life than in the later years. Absent provisions for recapture, the provider could pay off the best part of his capital expenses during the early years through Medicare reimbursements, then drop out of the program altogether and utilize the same capital assets in order to obtain profits from private patients.

A similar problem arose if the provider, although he did not actually terminate his participation in the Medicare program, experienced a substantial reduction in the proportion of Medicare patients served. By depreciating his capital assets on an accelerated basis, the provider was able to obtain reimbursement from the Medicare fund for expenses he would actually incur only in later years, when he was serving fewer Medicare patients, in proportion to the greater number of Medicare patients he served in the earlier years. In effect, therefore, services provided to non-Medicare patients in the later years were subsidized by large Medicare reimbursements made to the provider in the earlier years. This outcome ran counter to the Medicare statute's express principle that reimbursement to providers must be made in such a fashion that non-Medicare patients do not bear any Medicare-related costs and the Medicare program does not bear the cost of services provided to non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A).

In order to correct this problem, the Secretary promulgated new regulations qualifying the accelerated depreciation allowance with a recapture provision. 42 C.F.R. § 405.415(d)(3). The Third Circuit has held that "prospective application of this curative measure must, of course, be sustained, because it is 'reasonably related to the purposes of the enabling legislation.'" *Daughters of Miriam Center for the Aged v. Mathews, supra*, at 1261. If the Secretary's recapture regulations are to serve the purpose for which they were intended—the elimination of windfall benefits to providers resulting from a decline in Medicare utilization which cannot be anticipated at the outset—they clearly cannot be restricted by a three-year statute of limitations, as plaintiff proposes. Since any provider who accepted accelerated depreciation advances from the Medicare fund after August 1, 1970 was on notice that the advances might be recaptured, the provider cannot claim prejudice resulting from a recapture of such advances more than three years after he received them.

I conclude, therefore, that plaintiff's intermediary was not barred from recapturing the accelerated depreciation taken by plaintiff in the fiscal years 1971 through 1974 by the three-year limitations provisions set forth in the Medicare statute and the Secretary's reimbursement regulations.

Plaintiff next argues that the Secretary is estopped from recapturing accelerated depreciation based upon a decline in its Medicare utilization in the fiscal year 1977 by virtue of the fiscal intermediary's failure to recapture accelerated depreciation in earlier years when the conditions for recapture were also met. An analysis of the figures contained in the administrative record indicates that plaintiff experienced a decline in its Medicare utilization of sufficient proportion to trigger the recapture provisions not only in 1977 but also in the fiscal years 1972 and 1976.

Simply because an agent of the government commits an error in the application of regulations governing the disbursement of government funds does not

mean that the government is thereby estopped from subsequently applying the same regulations in a correct manner. *Cf. Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam). The intermediary gave plaintiff no affirmative assurance when it conducted its audits in 1972 and 1976 that it would never recapture accelerated depreciation, nor could plaintiff justifiably rely, by virtue of the intermediary's earlier errors, upon its continued misapplication of the governing reimbursement regulations. Plaintiff has made no showing on the administrative record that it actually did in any way rely to its detriment upon the intermediary's conduct. Indeed, if anything, plaintiff benefited from the intermediary's delay in effectuating recapture, since it had the use of the funds at issue for several years more than it would have otherwise. The Secretary is not, therefore, estopped by the earlier conduct of the intermediary, from recapture of plaintiff's accelerated depreciation based upon its decline in Medicare utilization in the fiscal year 1977.

For the foregoing reasons, the decision of the Provider Reimbursement Review Board with respect to the intermediary's recapture of accelerated depreciation in the fiscal year 1977 will be affirmed.

### III. *Disallowance of Legal Expenses*

■ Plaintiff next challenges the determination of the Board that the intermediary properly disallowed all legal expenses pertaining to the defense of plaintiff's principal, Frank Puzio, Sr., and properly submitted the legal expenses attributable to plaintiff's own defense to step-down cost allocation procedures. While plaintiff concedes that ordinary legal expenses incurred by a provider, being in the nature of overhead, are not attributable exclusively to either Medicare or non-Medicare patients and hence properly subject to step-down distribution, it contends that the legal fees at issue here were extraordinary expenses essential to the continued provision of services to Medicare patients, and thus attributable entirely to the Medicare program.

In characterizing the legal expenses incurred in defending criminal actions against itself and its principal as "extraordinary" expenses, plaintiff proves too much. Prior to determining whether expenses should be allocated entirely to the Medicare program or prorated between the Medicare and non-Medicare patients served by the facility, it must be determined whether the expenses in question are properly reimbursable under the Medicare statute at all. It is not altogether clear that legal fees expended for the defense of a *criminal* indictment charging Medicare fraud, whether the outcome of the criminal action is conviction or acquittal, constitute the type of expenses for which Congress intended Congress to reimbursed under the Medicare program.

The section of the Medicare statute governing reimbursable "reasonable costs," 42 U.S.C. § 1395x(v)(1)(A), provides that the Secretary is authorized to promulgate regulations excluding from reimbursement "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." In accordance with this mandate, the Secretary has authorized reimbursement only for "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities," and has specified that these are "usually costs which are *common and accepted occurrences* in the field of the provider's activity." 42 C.F.R. § 405.402(a) (emphasis added).

In *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572 (D.C.Cir.1980), the only case the parties have cited which directly concerns the reimbursability of legal expenses, the Court of Appeals for the District of Columbia Circuit held that expenses incurred by a provider in the *unsuccessful* defense of a *civil* action for Medicare fraud are not " 'reasonable cost[s]' related to providing health care to Medicare beneficiaries" and hence not reimbursable. *Id.* at 578. The court stated, however, that the district court had fashioned an overbroad rule when it held that legal expenses incurred in defending a civil legal action for Medicare *overpayment or fraud* were never reimbursable "whether the defendant prevails, or

loses, or the case is settled." *Id.* at 578, n. 5. "It does not follow," the Court of Appeals observed,

> that in all cases against the Government, a provider's litigation expenses are ineligible for reimbursement; it is here that we think the district court overextended the applicable standard. In a program as complicated as the Medicare reimbursement scheme, it can be expected that providers will have honest disputes with the Government or its fiscal agents over how much money is owing to whom. A provider that disagrees in good faith with the Government over the existence of an overpayment or underpayment is provided administrative and judicial procedures for the resolution of the dispute. The legal and accounting expenses associated with such litigation are part of the cost of participating in the Medicare program, and providers are entitled to reimbursement for those costs in accordance with the appropriate reimbursement formula. *Id.* at 578–79.

Accordingly, the Court of Appeals remanded the case for further factfinding by the administrative agency on the question whether a settlement of a civil action brought against the provider by the government constituted an unsuccessful defense of a fraud count, which would not be reimbursable, or merely the compromise of an honest dispute over an alleged overpayment, which may be reimbursable.

While a civil action brought by the government against a provider might involve no more than an "honest [dispute] with the Government or its fiscal agents over how much money is owing to whom," a *criminal* action brought against a provider is an altogether different matter. A criminal charge of fraud involves, by definition, a claim that the provider acted with a specific criminal intent, negating the possibility of an "honest dispute" between the government and the provider. Furthermore, a civil action for the recoupment of overpayments to the provider may be initiated by the government as a routine matter, but a criminal indictment is lodged only upon a showing of probable cause that the

defendant committed the act with which he is charged. Finally, while a civil defendant prevails only if he shows by a preponderance of the evidence that the government's claims are unjustified, the criminal defendant may be acquitted merely by demonstrating to a judge or jury that the government has not proved its case "beyond a reasonable doubt."

The defense of civil litigation might well be characterized as a routine business expense necessary for the day-to-day provision of medical services to Medicare recipients, and thus properly reimbursable under the regulations. The defense of criminal charges for Medicare fraud, on the other hand, whether the result is acquittal or conviction, clearly constitutes an "extraordinary" type of expense which is definitely not a "common and accepted occurrence in the field of the provider's activity." 42 C.F.R. § 405.402(a). One would anticipate the defense of such criminal charges to be the rare exception rather than the rule.

Plaintiff vigorously contends that "but for" the expenditure of legal fees for the defense of the criminal charges lodged against it, "it could not longer have provided services to Medicare participants." (Plaintiff's Brief at 13). From this proposition, it concludes that the expenditures in question were necessary for its "efficient delivery of needed health services." Whether plaintiff or its principal could have continued to remain in the business of providing medical services to Medicare patients without expending funds for its criminal defense, however, does not mean that such expenditures promoted the *efficient* delivery of health services or that the expenditures were "appropriate" or "common and accepted occurrences" in its field. These additional criteria must be met if the expenses for which reimbursement is claimed are to be found "reasonable."

Because legal fees incurred for the defense by a provider of a criminal action for Medicare fraud are not ordinary but extraordinary business expenses, and cannot be characterized as necessary for the "efficient

**1380**

delivery of needed health services," I conclude as a matter of law that such expenses are not "reasonable cost[s]" reimbursable under the Medicare program. They are not properly allocable to either Medicare or non-Medicare patients but can reasonably be expected to be borne by the provider, its principals or its stockholders themselves.

For the foregoing reasons, plaintiff's request that the decision of the Provider Reimbursement Review Board with respect to the disallowance of legal fees claimed in fiscal year 1978 be overturned will be denied. Since the government has not cross-appealed from the Board's determination that the provider is entitled to reimbursement on a step-down basis for the costs it incurred in defending against the corporate indictment, the agency's decision will be affirmed.

The attorney for the United States is requested to submit a form or order consistent with this opinion.